**Jens Schmidt, OSB #843417**
jens.schmidt@harrang.com
**Andrea D. Coit, OSB #002640**
andrea.coit@harrang.com
Harrang Long Gary Rudnick P.C.
360 East 10th Avenue, Suite 300
Eugene, OR 97401-3273
Telephone:     (541) 485-0220
Facsimile:     (541) 686-6564
Of Attorneys for Defendant City of Eugene

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **JUSTIN TYLER VANDEGRAAF,** | Case No.: 6:08-cv-6314-HO |
| Plaintiff, | **DECLARATION OF ANDREA COIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY THE CITY OF EUGENE** |
| vs. | |
| **CITY OF EUGENE, A MUNICIPALITY; OFFICER J. SHARLOW (No. 388), in his individual capacity and as a police official for the City of Eugene,** | |
| Defendants. | |

I, Andrea Coit, declare as follows:

1. I am one of the attorneys for the City of Eugene in the above captioned matter.

2. This case was filed on October 10, 2008.

3. There is no trial date set in this case.

Page 1 – **DECLARATION OF ANDREA COIT IN SUPPORT OF THE CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT**

4. By order of this court dated January 28, 2009, the discovery cut off deadline was set for May 11, 2009.

5. To date, plaintiff has not served any discovery requests on the City of Eugene.

6. To date, plaintiff has not requested or taken the deposition of any person associated with the City of Eugene in this case.

7. Attached hereto as Exhibit 1 are true and accurate copies of excerpts from the Deposition of Justin Vandegraaf, taken in this matter on April 28, 2009.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this __11__ day of May, 2009.

HARRANG LONG GARY RUDNICK P.C.

By: _/s/ Andrea D. Coit_
Jens Schmidt, OSB #843417
jens.schmidt@harrang.com
Andrea D. Coit, OSB #002640
andrea.coit@harrang.com
Telephone:     (541) 485-0220
Facsimile:     (541) 686-6564

Of Attorneys for Defendant City of Eugene

Page 2 – **DECLARATION OF ANDREA COIT IN SUPPORT OF THE CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT**

---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE STATE OF OREGON

JUSTIN TYLER VANDEGRAAF, )
    Plaintiff, )
vs. ) No. 6:08-cv-6314-HO
CITY OF EUGENE, A MUNICIPALITY; )
OFFICER J. SHARLOW (NO. 388), )
in his individual capacity and )
as a police official for the )
City of Eugene, )
    Defendants. )

DEPOSITION OF JUSTIN TYLER VANDEGRAAF

THE DEPOSITION OF JUSTIN TYLER VANDEGRAAF was taken as a witness on behalf of Defendant City of Eugene, pursuant to Oregon Rules of Civil Procedure, at 9:35 a.m. on Tuesday, the 28th day of April 2009, at the law offices of Harrang Long Gary Rudnick, P.C., 360 East 10th Avenue, Suite 300, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

---

**Page 3 — Index - J. VandeGraaf**

I N D E X

| Witness | Page |
|---|---|
| JUSTIN TYLER VANDEGRAAF | |
|   By Ms. Coit | 4, 124 |
|   By Mr. Vergamini | 111 |

EXHIBITS:

| Identification | | Marked |
|---|---|---|
| No. 1 | Police report | 61 |
| No. 2 | Request for Production | 102 |
| No. 3 | First Set of Interrogatories | 102 |

---

**Page 2 — Appearances - J. VandeGraaf**

A P P E A R A N C E S

For the Plaintiff:
  MICHAEL VERGAMINI
  Attorney at Law
  399 East 10th Avenue, Suite 207
  Eugene, Oregon 97401
  541/302-1800
  BY: MR. MICHAEL VERGAMINI
     mdvergamini@efn.org

For Defendant City of Eugene:
  HARRANG LONG GARY RUDNICK, P.C.
  Attorneys at Law
  360 East 10th Avenue, Suite 300
  Eugene, Oregon 97401
  541/485-0220
  BY: MS. ANDREA COIT
     andrea.coit@harrang.com

Also Present:
  MS. CATHY JOSEPH

Reported by:
  ELEANOR G. KNAPP, CSR-RPR

---

**Page 4 — J. VandeGraaf**

1          JUSTIN TYLER VANDEGRAAF,
2 as an adverse-party witness on behalf of Defendant
3 City of Eugene, having been first duly sworn to
4 testify the truth, the whole truth, and nothing but
5 the truth, was examined and testified as follows:
6
7          E X A M I N A T I O N
8 BY MS. COIT:
9    Q.   Good morning. My name is Andrea Coit.
10 I'm an attorney for the City of Eugene in the
11 lawsuit that you have filed against the City of
12 Eugene. We just met a moment ago. And I just want
13 to go over a few ground rules before we start your
14 deposition.
15   A.   Okay.
16   Q.   So have you given a deposition before?
17   A.   Never.
18   Q.   The most important thing is to answer all
19 my questions verbally so the court reporter can take
20 everything down and to let me finish asking a
21 question before you answer. Okay?
22   A.   Okay.
23   Q.   Okay. And no nodding because she can't
24 put that down.
25   A.   I understand.

J. VandeGraaf          VandeGraaf v City of Eugene          4/28/09

### Page 25

```
            J. VandeGraaf                              25
 1              MR. VERGAMINI:  Can I have a word with
 2  him?
 3              (A recess was taken.)
 4              MR. VERGAMINI:  He is going to amend
 5  his answer to the last question.
 6      A.      You were talking about ever in my life?
 7  BY MS. COIT:
 8      Q.      Certainly.
 9      A.      So I did engage in drug use before the age
10  of 18.
11      Q.      And with that understanding, before the
12  age of 18, you told me marijuana, cocaine.  Was
13  there anything else?
14      A.      Yes.  I took mushrooms once when I was in
15  high school, too.
16      Q.      Since the age of 18 have you used any
17  illegal drugs?
18      A.      No.
19      Q.      In October 2006 were you on any sort of
20  prescription medications?
21      A.      No.
22      Q.      Did you drink in 2006, the year?
23      A.      Yes.
24      Q.      Can you estimate for me about how often
25  you would drink during the year of 2006?
```

### Page 26

```
            J. VandeGraaf                              26
 1      A.      It was never something that was big into
 2  my life where it was that regular.
 3      Q.      Would you drink at home?
 4      A.      Sometimes.  Rarely.
 5      Q.      And at this point you were living with
 6  Tiffanie and your daughter?
 7      A.      I was.
 8      Q.      Did Tiffanie drink?
 9      A.      Rarely.
10      Q.      When you would drink at home, what would
11  you drink?
12      A.      Sometimes we would get a bottle of vodka,
13  maybe.  Or I remember once we got a bottle of
14  champagne.  But I'm not really that big a drinker.
15      Q.      How about when you would go out with
16  friends?
17      A.      We would generally have two or three
18  drinks and then I would go home.  I was kind of
19  known as the party pooper who would leave early.  I
20  was the only one that worked and had a child.  And I
21  also had two jobs.
22      Q.      What was your other job?
23      A.      At the time I worked at El Vaquero
24  Restaurant as well.  So if you figure there is seven
25  lunches in a week and seven dinners in a week, I
```

### Page 27

```
            J. VandeGraaf                              27
 1  worked 13 out of those 14 shifts.
 2      Q.      What time did you work at Vaquero?
 3      A.      Shortly after I got a DUI.  I needed money
 4  to pay for my lawyer, so I got a second job.
 5      Q.      Who was your lawyer in the DUI?
 6      A.      Douglas Dennett.
 7      Q.      What was his last name?
 8      A.      Dennett.
 9      Q.      How long did you work at Vaquero?
10      A.      Until I went to jail.
11      Q.      Now, when you would go out with friends,
12  have two or three drinks, how often would you do
13  that?  Once a week, twice a week?
14      A.      Maybe once a week.
15      Q.      Would you normally get drunk?
16      A.      No.
17      Q.      What was your usual drink?
18      A.      Vodka Red Bull.
19      Q.      Have you ever been a bartender?
20      A.      I have for, you know, making a drink at
21  places that I work at.  Bartenders step out; servers
22  have to pour their own drinks.  I've bartended at
23  functions before where you are a server and a
24  bartender, catering type events.  Stuff like that.
25      Q.      How, in your opinion, does alcohol affect
```

### Page 28

```
            J. VandeGraaf                              28
 1  you?
 2      A.      Much the same way it affects everybody
 3  else, I assume.
 4      Q.      Tell me your experience.
 5      A.      It's a mood enhancer.  So if you are in a
 6  good mood, then it enhances that.  If you are in a
 7  bad mood, it enhances that.  I've been serving
 8  alcohol for over a decade, so I'm well aware of how
 9  it affects you.  It affects your judgment.  It
10  reduces your inhibitions.
11      Q.      I'm asking you personally.
12      A.      It reduces my inhibitions.  It affects my
13  judgment.  It affects my reaction time.  And yes,
14  it's a mood enhancer.  So if I were sad, it would
15  probably make me more sad.  If I was happy, it would
16  probably make me more happy.
17      Q.      Have you ever blacked out from drinking?
18      A.      Yes.  Before the age of 18.
19      Q.      Since the age of 18 have you ever woken up
20  in the morning and not remembered what happened the
21  night before?
22      A.      Twice.
23      Q.      Were either of those times in October
24  2006?
25      A.      Neither of those times were in October of
```

```
                    J. VandeGraaf                        29
 1  2006. In October of 2006 I was assaulted, and I
 2  remember, up until my head was crushed into the
 3  pavement by a police officer's boot, everything that
 4  happened. And after that, I don't remember anything
 5  until I woke up inside the jail the next morning.
 6      Q.   We'll get into that in just a minute.
 7  Have any of your family, friends told you they were
 8  concerned about your drinking?
 9      A.   No.
10      Q.   Are you diabetic?
11      A.   No.
12      Q.   Have you been to drug or alcohol treatment
13  class?
14      A.   I have. I went to Prevention Northwest,
15  whatever it's called, on Olive Street.
16      Q.   Was that court-mandated?
17      A.   It was.
18      Q.   How long was the treatment class?
19      A.   Like nine months.
20      Q.   How often did you have to go?
21      A.   Every week.
22      Q.   Once a week?
23      A.   I think it was just once a week. Yeah.
24      Q.   What did the treatment entail?
25      A.   Going to a class, taking a drug test, and
```

```
                    J. VandeGraaf                        30
 1  going to outside AA meetings and not doing any
 2  alcohol or drugs and being an active, participating
 3  member in class.
 4      Q.   So were you drinking during the time in
 5  between July and October 2006?
 6      A.   I did.
 7      Q.   How did you pass the test?
 8      A.   I wasn't enrolled in the class yet.
 9      Q.   When did you start the class?
10      A.   After I was released from jail.
11      Q.   So for the diversion, you didn't have to
12  go to class?
13      A.   Well, it was all pushed out. So I didn't
14  start it until afterwards.
15      Q.   Did you follow the mandate not to drink?
16      A.   I did.
17      Q.   Are you currently not allowed to drink?
18      A.   That is correct.
19      Q.   Do you know anybody employed by the Eugene
20  police?
21      A.   Personally? No. I'm not friends with any
22  of the Eugene police officers.
23      Q.   Does any of your family work for Eugene
24  police?
25      A.   Never. My family is not from here.
```

```
                    J. VandeGraaf                        31
 1      Q.   Have you ever dated anyone who worked for
 2  the Eugene police?
 3      A.   No.
 4      Q.   No friends ever worked for the police?
 5      A.   No.
 6      Q.   Have you ever worked for the Eugene
 7  police?
 8      A.   No.
 9      Q.   Have you ever discussed police training
10  with anyone from the Eugene police?
11      A.   No.
12      Q.   How about from the City of Eugene?
13      A.   From the City of Eugene?
14      Q.   Anyone that works for the City of Eugene?
15      A.   No. I talked to sheriffs when I was in
16  custody at the jail about protocol because I was
17  trying to figure out how things are supposed to be
18  done.
19      Q.   Tell me about that conversation.
20      A.   Well, when you are taken out of a vehicle
21  at the sally port, a police officer walks behind you
22  approximately maybe three steps. And you are in
23  full visibility the entire time until you get up to
24  the door. And they lean you against the wall, and
25  they have you stand there while they take off their
```

```
                    J. VandeGraaf                        32
 1  gun, their baton, any type of weapons that they
 2  have. They put it in a special locker because
 3  there's no weapons allowed in jail. They get you
 4  again, the door opens, and you guys go inside
 5  together.
 6      Q.   Tell me what that is. Is that something
 7  somebody told you?
 8      A.   If you get out of the vehicle, that's how
 9  you are supposed to be brought in.
10      Q.   Somebody told you that?
11      A.   Yes.
12      Q.   Who told you that?
13      A.   A sheriff.
14      Q.   What was his name?
15      A.   I don't remember.
16      Q.   A sheriff?
17      A.   A sheriff's deputy. Somebody who was with
18  me the whole time I had my surgeries and would
19  escort me to the hospital and back.
20           MR. VERGAMINI: Ms. Coit, can I take a
21  real quick break?
22           (A recess was taken.)
23  BY MS. COIT:
24      Q.   All right. We are back on the record.
25  Before we took a break I was asking you about what a
```

```
                    J. VandeGraaf                   33
 1  sheriff deputy had told you about protocol. And you
 2  were going to tell me when this person had told you
 3  that.
 4      A.   He told me while I was in the car with
 5  him.
 6      Q.   What day was this?
 7      A.   October 11th.
 8      Q.   Where were you going in the car with him?
 9      A.   Sacred Heart Medical Center.
10      Q.   (Sneeze.)
11      A.   God bless you.
12      Q.   Thank you. Was this the second time you
13  were taken to the hospital?
14      A.   Yes.
15      Q.   You don't recall his name?
16      A.   No.
17      Q.   Now, tell me specifically what you asked
18  that officer.
19      A.   I asked the officer how a person was
20  supposed to be transported.
21      Q.   That's all you asked him?
22      A.   Exactly.
23      Q.   What was his response?
24      A.   He told me how you are supposed to be
25  transported.
```

```
                    J. VandeGraaf                   34
 1      Q.   And what did he say?
 2      A.   He said that this is the way he does it.
 3  And I witnessed that because I was the inmate and he
 4  was the guard.
 5      Q.   When did you witness that?
 6      A.   When I walked to the car to get into it,
 7  when I was escorted from the car into the hospital,
 8  when I was escorted from the hospital back to the
 9  car, when I was escorted from the car back to the
10  jail, when I was escorted from the car into the
11  jail.
12      Q.   And so what he told you was what you told
13  us earlier about take the gun off, put it in the
14  locker?
15      A.   Exactly.
16      Q.   Were you intoxicated at any time you were
17  with this other officer?
18      A.   No.
19      Q.   Were you cooperative with him?
20      A.   Yes.
21      Q.   Did you physically assault him?
22      A.   No.
23      Q.   Were you handcuffed?
24      A.   Yes.
25      Q.   So are you telling me this officer would
```

```
                    J. VandeGraaf                   35
 1  take his gun off while you were standing there with
 2  him?
 3      A.   Yes.
 4      Q.   Did you know Officer Sharlow before he
 5  arrested you?
 6      A.   No.
 7      Q.   Have you spoken with Officer Sharlow since
 8  the night you were arrested?
 9      A.   No.
10      Q.   And the night we are talking about is
11  October 9, 2006?
12      A.   On or about.
13      Q.   You have not spoken to him since that
14  night?
15      A.   I have not, no.
16      Q.   Have you talked to anyone from the City of
17  Eugene about Officer Sharlow's training?
18      A.   About his training? No.
19      Q.   Have you talked to anyone from the City of
20  Eugene about Officer Sharlow's disciplinary history?
21      A.   No.
22      Q.   Have you done any investigation to try and
23  find out what kind of training Officer Sharlow has
24  received?
25      A.   No.
```

```
                    J. VandeGraaf                   36
 1      Q.   How about training in general at the City
 2  of Eugene? Have you talked to anyone about
 3  training?
 4      A.   I guess I don't really understand the
 5  question. I assume all police officers are trained.
 6  How they are trained is not important to me.
 7           I haven't ever talked to anybody about any
 8  type of training that any police enforcement has
 9  done anywhere I've lived, including here. It's not
10  something I am interested in or I would talk about
11  with friends or strangers.
12      Q.   So sitting here today, do you have any
13  reason to believe that the police officers in Eugene
14  aren't properly trained?
15      A.   No.
16      Q.   Have you ever reviewed any training
17  documents or manuals from the City of Eugene?
18      A.   No.
19      Q.   Where were you living in October 2006?
20      A.   Broadway Center Apartments.
21      Q.   What was the address?
22      A.   I don't remember. It was like 864 8th
23  Avenue. But like I said, I can't be exactly
24  positive. I haven't lived there for a couple of
25  years.
```

```
                                  J. VandeGraaf                          41
 1  before you went home that night?
 2     A.    I don't remember.
 3     Q.    Was it more than three?
 4     A.    Probably.
 5     Q.    Would it be more than ten?
 6     A.    I couldn't answer that question.
 7     Q.    Do you think you were drunk?
 8     A.    I was intoxicated.
 9     Q.    Is there a difference between drunk and
10  intoxicated?
11     A.    Yes.
12     Q.    What's the difference?
13     A.    Intoxicated means you have alcohol in your
14  system.  Drunk means you are no longer able to
15  maintain composure over your body.
16     Q.    You felt you had composure but you had
17  alcohol in your system?
18     A.    Exactly.
19     Q.    If you were driving, do you think you
20  could be arrested for DUI?
21     A.    Yes.  You cannot have any alcohol in your
22  system.  Even if it's below .08, you can still get
23  arrested for drinking and driving.  You are not
24  supposed to have anything to drink before you drive.
25     Q.    Was your blood alcohol level tested at any
```

```
                                  J. VandeGraaf                          42
 1  point?
 2     A.    No.
 3     Q.    So sitting here today you don't believe
 4  you were drunk?
 5     A.    No.
 6     Q.    Did you have full control over your
 7  judgment?
 8     A.    No.
 9     Q.    Was your judgment impaired?
10     A.    Yes.
11     Q.    Are you a violent person?
12     A.    No.
13     Q.    Had you ever hit women before the night of
14  October 10th?
15     A.    No.
16     Q.    Do you think Chelsea would remember that
17  you were drunk?
18     A.    I can't answer what somebody else would
19  remember.
20     Q.    Was she drunk?
21     A.    Not that I remember.  She was a little
22  thing.  I think she maybe had one or two drinks.  I
23  came to find out later on in our relationship that
24  she was allergic to alcohol.  She actually turned
25  red.  So it was an unfortunate thing for her.
```

```
                                  J. VandeGraaf                          43
 1     Q.    Had you taken any drugs on October 10th,
 2  2006?
 3     A.    No.
 4     Q.    Have you ever been drunk before?
 5     A.    I have.
 6     Q.    Are you violent when you are drunk?
 7     A.    No.
 8     Q.    Never been violent when you're drunk?
 9     A.    No.
10     Q.    Have you ever been in a fight, physical
11  fight?
12     A.    Yes.  I was a child once.
13     Q.    Since the age of 20 have you ever been in
14  a physical fight?
15     A.    No.
16     Q.    No?
17     A.    No.
18     Q.    All right.  So you and Chelsea were out
19  drinking at Jackalope.  That's in Eugene?
20     A.    That is.
21     Q.    Is that on 6th?
22     A.    No.  It's across from the train station on
23  Willamette.
24     Q.    And do you recall what time you left
25  Jackalope?
```

```
                                  J. VandeGraaf                          44
 1     A.    Late.
 2     Q.    What does that mean to you?
 3     A.    Midnight.
 4     Q.    Where did you go when you left?
 5     A.    I walked home.
 6     Q.    Where did Chelsea go?
 7     A.    She drove home.
 8     Q.    Did she offer you a ride?
 9     A.    No.
10     Q.    At some point before you left to go home
11  did you call Tiffanie?
12     A.    On the way home from Jackalope's to my
13  apartment, I tried to call Chelsea to make sure that
14  she got home okay.  And because I had been drinking
15  -- on my phone, if you hit Talk you can call the
16  person that you just missed the call from.  So I
17  accidentally called Tiffanie.  And when she answered
18  I was like, "Did you get home okay?"
19           And at that point I realized that I had
20  called the wrong person, so I just hung up.
21     Q.    You didn't recognize Tiffanie's voice when
22  she answered?
23     A.    No.
24     Q.    Would you normally recognize her voice?
25     A.    Yes.
```

**Page 53**

```
 1  tried to get you arrested before.
 2      A.    Nope.
 3      Q.    Were you surprised that she was making
 4  this stuff up?
 5      A.    Yes.
 6      Q.    Did you talk to Tiffanie after this night?
 7      A.    Nope.
 8      Q.    So when did she leave with your daughter?
 9      A.    I don't know. I was in jail.
10      Q.    You didn't try and call her?
11      A.    No.
12      Q.    Try and ask her, "Why are you making this
13  stuff up about me?"
14      A.    Well, I was in jail, so there's no phone
15  calls despite any type of illusion you might have of
16  what your rights are in jail.
17            And I was also not allowed to have any
18  contact with her after I had gone to court because
19  while I was in jail I was -- I received a
20  restraining order.
21      Q.    So are you testifying that you didn't make
22  any phone calls while you were in jail?
23      A.    No. I did make a phone call when I was
24  allowed to.
25      Q.    Who did you call?
```

**Page 54**

```
 1      A.    I believe I tried to call my family.
 2      Q.    Did you speak --
 3      A.    I tried to call friends, but I didn't have
 4  my phone. I didn't have any of my phone numbers. I
 5  don't really remember who I was able to get ahold
 6  of. I remember the first person that came to see me
 7  was Volmert, John Volmert, some nothing attorney in
 8  town. Public pretenders they call them.
 9      Q.    I'm sorry?
10      A.    Public defender, John Volmert.
11            MR. VERGAMINI: Ms. Coit, may I speak
12  to my client?
13            MS. COIT: Certainly.
14            (A recess was taken.)
15  BY MS. COIT:
16      Q.    All right. Before the break we were
17  talking about any phone calls you had in jail. At
18  some point did you call your mother?
19      A.    I'm sure I did. I can't remember.
20      Q.    So you don't remember the phone call with
21  your mother?
22      A.    No, I don't.
23      Q.    When you left your apartment, what were
24  you wearing?
25      A.    A black pair of pants and a green
```

**Page 55**

```
 1  Steelhead Hopasaurus Rex hooded sweatshirt.
 2      Q.    Was your sweatshirt on backwards?
 3      A.    It was.
 4      Q.    Were you still intoxicated?
 5      A.    Yes.
 6      Q.    But not drunk.
 7      A.    No.
 8      Q.    Did you have any shoes on?
 9      A.    No.
10      Q.    Do you sleep outside a lot?
11      A.    No.
12      Q.    Were you planning to sleep outside?
13      A.    Yes.
14      Q.    Did you take a pillow with you?
15      A.    No.
16      Q.    Blanket?
17      A.    No.
18      Q.    Was it cold?
19      A.    Yes.
20      Q.    You said you laid down on the ground next
21  to your Lexus?
22      A.    Yes.
23      Q.    What kind of Lexus do you have?
24      A.    I had an LS400, 1990.
25      Q.    Did you pass out?
```

**Page 56**

```
 1      A.    I went to sleep.
 2      Q.    How long did it take you to go to sleep
 3  once you laid down?
 4      A.    Because I wasn't fully asleep -- I was in
 5  a light sleep -- so probably not more than a minute
 6  or two until I was woken up.
 7      Q.    When you were walking to the parking lot,
 8  did you see two officers pass you by?
 9      A.    No.
10      Q.    When is the first time you saw the
11  officers?
12      A.    When I woke up.
13      Q.    When you woke up outside on the pavement?
14      A.    Yes.
15      Q.    Did they wake you up?
16      A.    Yes.
17      Q.    Did they identify themselves?
18      A.    Yes.
19      Q.    Do you remember who it was?
20      A.    Yes.
21      Q.    Who?
22      A.    Officer Sharlow, Officer Vreim.
23      Q.    Had you met Officer Vreim before this
24  night?
25      A.    No.
```

J. VandeGraaf                    VandeGraaf v City of Eugene    4/28/09

---

J. VandeGraaf                                                            57

1  Q.  And you already told me you hadn't met
2  officer Sharlow before.
3  A.  Yes.
4  Q.  What did the officers say to you?
5  A.  They asked me who I was.
6  Q.  And did you tell them?
7  A.  Yes.
8  Q.  What did you say?
9  A.  Justin VandeGraaf.
10 Q.  Did you have any ID with you?
11 A.  No.
12 Q.  Did they ask to see your ID?
13 A.  No.
14 Q.  What happened after that?  Did they say
15 anything else to you?
16 A.  They arrested me.
17 Q.  Before they arrested you, did they say
18 anything else to you?
19 A.  I don't remember.
20 Q.  You don't remember?
21 A.  No.
22 Q.  What do you remember?
23 A.  I remember they asked me who I was.
24 Q.  Okay.
25 A.  Then they helped me get up.  And they put

---

J. VandeGraaf                                                            58

1  handcuffs on me, and they put me into one of their
2  cars.
3  Q.  Do you think they said anything to you?
4  A.  I'm sure they did.
5  Q.  You just don't remember?
6  A.  No.
7  Q.  Do you remember saying anything to them?
8  A.  I do.
9  Q.  What did you say?
10 A.  I remember that it wasn't my most stellar
11 moment, and I said things I regret and I wish I
12 could take back.  Unfortunately, I cannot.  Things
13 that are inappropriate that I would rather not
14 repeat.
15 Q.  I understand, but I'm going to ask you to
16 repeat it.
17 A.  Okay.  I asked one of the officers if -- I
18 probably asked both of them if they had any
19 children.  Officer Vreim told me he had a son.  I
20 told him I hope his son dies.
21 Q.  Why did you say that?
22 A.  Because they were taking me away from my
23 daughter.
24 Q.  Did you say anything else to them?
25 A.  I'm sure, being upset, I said other

---

J. VandeGraaf                                                            59

1  things.  Like I said, I can't really remember
2  exactly what so I can't go on record saying that I
3  said something if I can't remember exactly what.
4       But what I did just tell you is something
5  I do remember and I did say.  And like I said, it
6  was very unfortunate.
7  Q.  Did you get up off the ground by yourself?
8  A.  Yes.
9  Q.  Nobody had to help you?
10 A.  I remember that they wanted to help assist
11 me getting up quicker, so one of them grabbed my
12 arm.
13 Q.  And did they tell you why you were being
14 arrested?
15 A.  I don't know.
16 Q.  You don't remember?
17 A.  No.
18 Q.  In this lawsuit are you challenging the
19 basis for that arrest?
20 A.  I guess I don't know what that means.
21 Q.  Okay.  Do you believe the officers had a
22 valid reason to arrest you at that point from what
23 they had learned from Tiffanie?
24 A.  Well, if, you know, I told you that it was
25 raining money outside and you agreed with me, then,

---

J. VandeGraaf                                                            60

1  you know, yeah, I guess they were just.
2       Going based on what one person said and
3  with no physical evidence, no, I don't think they
4  were.  I think that if someone says that they were
5  raped that they have to prove that they were raped.
6  They can't just say, "I was raped."
7  Q.  Before someone is arrested?
8  A.  Exactly.  So I understand the system works
9  differently.  So I'm sure in their eyes, yes, it was
10 a precautionary measure in case what she was saying
11 was true.  Better to get me out of there.
12      MR. VERGAMINI:  I'll just put an
13 objection on the record inasmuch as the question
14 asks for him to make a legal conclusion.
15      MS. COIT:  Understood.
16 BY MS. COIT:
17 Q.  Looking back on it today, knowing what the
18 officers knew at that point, do you think you should
19 have been arrested?
20 A.  Yes.
21 Q.  Have you reviewed the police report in
22 this case?
23 A.  Thoroughly.
24 Q.  Do you recall the portions where the
25 officers wrote down what you had been saying to

---

---

J. VandeGraaf                                                          61

1  them?
2   A.   Yes.
3   Q.   Do you agree with those statements?
4   A.   I don't disagree with them.
5           (Deposition Exhibit No. 1
6            marked for identification.)
7  BY MS. COIT:
8   Q.   Can you take a look at Exhibit 1? Look at
9  the whole thing, tell me if you recognize what it
10 is.
11  A.   Yep. I remember it. I got it while I was
12 in jail. It let me know that I was being charged
13 with all these criminal charges.
14  Q.   When I just asked you if you had reviewed
15 the police report and you said yes, is this the
16 document you are referring to?
17  A.   I've got to look at all of it.
18       It seems like it was longer, but maybe
19 not. Yep. That looks like it.
20  Q.   Let me have you look at page -- it's up in
21 the right-hand corner -- it says page 5 of 6.
22  A.   Yep.
23  Q.   One, two, three, four paragraphs down.
24 Can you read that?
25  A.   (Reading): VandeGraaf was surly,

---

J. VandeGraaf                                                          62

1  profane, and uncooperative. He provided
2  Officer Vreim with his name. He told Officer
3  Vreim to, "Suck my dick and lick my balls."
4  VandeGraaf pleaded for us to 'beat me to
5  death' so he could sue us.
6   Q.   Do you agree with that statement?
7        MR. VERGAMINI: Object to the form of
8  the question.
9  BY MS. COIT:
10  Q.   Do you agree with the description that you
11 were surly, profane, and uncooperative?
12  A.   No. I think I was cooperative.
13  Q.   Do you agree with the statement that you
14 told Officer Vreim to "suck my dick and lick my
15 balls"?
16  A.   Yes.
17  Q.   You did say that?
18  A.   Yes.
19  Q.   Did you plead with them to beat you to
20 death so you could sue them?
21  A.   No. I don't remember that.
22  Q.   Can you put that aside for a second, but
23 keep it with you.
24       Now, when you got on your feet in the
25 parking lot, where did they take you?

---

J. VandeGraaf                                                          63

1   A.   Maybe 50 feet away from my car to their
2  police cruiser. And I was put in the back seat.
3   Q.   Were you handcuffed?
4   A.   I was, behind my back.
5   Q.   When were you handcuffed?
6   A.   Before I got in the car.
7   Q.   Before you started walking to the car?
8   A.   Yes.
9   Q.   Did you have any trouble walking?
10  A.   No.
11  Q.   Who took you to jail?
12  A.   Officer Sharlow.
13  Q.   Did you see where Officer Vreim went?
14  A.   I wasn't paying attention. But he stayed.
15  Q.   He stayed?
16  A.   He stayed. Yes. He didn't come with us.
17  Q.   Was anyone in the -- anyone else in the
18 police car with you?
19  A.   No. Me and Sharlow.
20  Q.   Now, on the ride to the police station did
21 you say anything to Officer Sharlow?
22  A.   I don't remember.
23  Q.   Did he say anything to you?
24  A.   Not that I remember.
25  Q.   Did you lay down in the back seat?

---

J. VandeGraaf                                                          64

1   A.   No.
2   Q.   So you sat up the whole time?
3   A.   (Witness nodded head.)
4   Q.   Yes?
5   A.   Yes.
6   Q.   You didn't pass out?
7   A.   No.
8   Q.   Where did the police car pull in?
9   A.   To the sally port of the Lane County
10 Correctional Facility on 5th Avenue.
11  Q.   Had you been to the sally port before?
12  A.   No -- Yes.
13  Q.   When?
14  A.   When I got my DUI.
15  Q.   Did you know it was called a sally port?
16  A.   No. I don't think I was really hip to the
17 name before that.
18  Q.   How are you hip to the name now?
19  A.   I was there, so I know what things are
20 called.
21  Q.   You were what?
22  A.   I was in jail.
23  Q.   So you pulled in the sally port. Was
24 there anyone else in there?
25  A.   No.

---

J. VandeGraaf                                                                  69

1  Q.   If he just wanted you to fall, why
2  wouldn't he just push you back?
3  A.   I don't know.
4  Q.   Do you think he was maybe trying to break
5  your fall?
6  A.   No, I don't.
7  Q.   Were you being uncooperative?
8  A.   No.
9  Q.   How long did this whole incident take from
10 the time you got up out of the car until you were on
11 the ground?
12 A.   A moment.
13 Q.   Just a moment?
14 A.   A moment. Two minutes.
15 Q.   Two minutes?
16 A.   Yeah. A moment. Two minutes. I don't
17 know.
18 Q.   Closer to two minutes or a moment?
19 A.   What would you classify as a moment? A
20 moment in time to me --
21 Q.   A second?
22 A.   A second? It was more than one second.
23 Q.   So you stood up. Did you stand there for
24 a few seconds?
25 A.   No. I fell right away.

---

J. VandeGraaf                                                                  70

1  Q.   But it may have been two minutes?
2  A.   From when I got up, yeah.
3  Q.   What did you do after you got up?
4  A.   I didn't.
5  Q.   Didn't what?
6  A.   I didn't get up.
7  Q.   Okay. What I'm asking you is when you
8  stood up out of the car -- You are standing there
9  next to the car. Was it a few minutes that you
10 stood there?
11 A.   It was right away.
12 Q.   Right away what happened? Is that when
13 Officer Sharlow put his hand on you?
14 A.   Yes.
15 Q.   No words were said?
16 A.   Not that I remember. I'm sure I was
17 talking to him. I'm sure I was mouthing off. I
18 wasn't being uncooperative.
19      And I guess one thing that's really
20 important to know is that if a police officer or a
21 sheriff is going to have any problem with anyone,
22 then they call the sheriff's department and they
23 say, "We have somebody who is going to be a
24 problem." And they turn their cameras on in the
25 sally port so they can videotape everything and

---

J. VandeGraaf                                                                  71

1  they've got it on video.
2       And then they've got guys in the sheriff's
3  department with riot gear and pads and protection
4  and helmets, and they come out and make sure that
5  you are not going to be difficult.
6  Q.   So I guess what you're saying is there was
7  reason for Officer Sharlow to believe you were going
8  to be difficult?
9  A.   If there was he would have called up and
10 have them turn the cameras on.
11 Q.   So he didn't know you were going to be
12 difficult?
13 A.   I hadn't been difficult and I wasn't going
14 to be difficult. I don't think that's why he
15 called.
16 Q.   Who did he call?
17 A.   He didn't. That's what I'm saying. If I
18 had been, that's, I guess, sort of protocol.
19 Q.   According to who?
20 A.   According to me, I guess.
21 Q.   So this is your idea of what protocol is?
22 A.   I witnessed it while I was in jail. And I
23 saw it happen, so I was like, oh, that must be what
24 it's like if you are being difficult.
25 Q.   You witnessed something in the sally port?

---

J. VandeGraaf                                                                  72

1  A.   No. I was in jail.
2  Q.   So this has nothing to do with somebody
3  being taken out of a car.
4  A.   No. It wasn't out of a car. It was
5  brought in.
6  Q.   So let me take you back. I just want to
7  get straight on exactly what happened when you got
8  out of the car. You stood up. And you think you
9  may have said something?
10 A.   Yep.
11 Q.   Do you think Officer Sharlow may have said
12 something back to you?
13 A.   He could have.
14 Q.   Do you not remember?
15 A.   I don't.
16 Q.   Do you maybe not remember chest bumping
17 him, then?
18 A.   I guess what -- No. I don't recall chest
19 bumping him. That's why I said I didn't bump his
20 chest.
21 Q.   Is it possible it could have happened,
22 though?
23 A.   I'm saying no. I mean, you are asking if
24 something's possible.
25 Q.   Well, you are telling me you don't

---

**J. VandeGraaf** — 73

1 remember if you said anything to him, but you
2 probably did. So I'm asking if maybe you did chest
3 bump him and you just don't remember. Is that
4 possible?
5    A.   Anything's possible. I don't remember
6 doing it.
7    Q.   Okay. Did you know Officer Sharlow was
8 taking you to the ground before it happened?
9    A.   No.
10   Q.   So it came out of nowhere?
11   A.   Came out of nowhere.
12   Q.   So you weren't in fear of falling to the
13 ground and hurting yourself?
14   A.   No.
15   Q.   Have you been trained in how a police
16 officer is supposed to take someone to the ground?
17   A.   No.
18   Q.   Do you know if Officer Sharlow has been
19 trained in how to take someone to the ground?
20   A.   I sure hope he has. He is a Eugene city
21 police officer and he has a right to protect and
22 serve, not to beat and punish.
23   Q.   He has a right or a duty?
24   A.   A duty. I don't know. Use whatever words
25 you want. I didn't go to college. Remember?

**J. VandeGraaf** — 74

1    Q.   So you don't know if he has been trained
2 in how to take someone to the ground?
3    A.   No. I don't know.
4    Q.   Do you know if the Eugene police
5 department has a training program on how to take
6 prisoners to the ground?
7    A.   I don't.
8    Q.   Do you know if the actual tripping move
9 that Officer Sharlow used to take you to the ground
10 was approved by the Eugene police department?
11   A.   I don't.
12   Q.   Do you have any reason to believe it
13 wasn't approved?
14   A.   I do. Yep.
15   Q.   Tell me.
16   A.   My brother's in the military. And I
17 actually do know a lot of law enforcement agents and
18 -- you know, over the years meeting people. And you
19 are not allowed to physically strike somebody that's
20 got handcuffs on, whether it be with your leg or
21 your arm. As far as I've been told, it's considered
22 illegal.
23        If a person is not handcuffed, that's a
24 totally different story. So like I said, that's
25 just what I -- I guess I believe and I thought was

**J. VandeGraaf** — 75

1 the law.
2    Q.   So in this situation, you consider the leg
3 sweeping out as striking you?
4    A.   Yes. Most definitely. I think if I were
5 to do that to another human being it would be
6 considered assault.
7    Q.   You are not a police officer. Right?
8    A.   I'm not.
9    Q.   Now, have you -- since you filed this
10 lawsuit, have you done any investigation to find out
11 if this little move was illegal?
12   A.   Little move? No.
13   Q.   Have you done anything to find out whether
14 or not how Officer Sharlow took you to the ground
15 was acceptable under the Eugene police department
16 policies?
17   A.   It doesn't really matter to me, I guess,
18 whether it's acceptable or not. That's why I filed
19 a lawsuit, because it's not acceptable to me.
20        I suppose if I had been brought to the
21 ground and I had caught a scratch or maybe just this
22 laceration that opened up my chin that they sewed up
23 and put a titanium plate in, I could have let it go.
24 But my jaw was broken in two different places and I
25 was missing two teeth.

**J. VandeGraaf** — 76

1    Q.   Okay. So --
2    A.   So not acceptable.
3    Q.   -- not acceptable to you?
4    A.   To me.
5    Q.   But you don't know if it was acceptable --
6    A.   No, I don't know.
7    Q.   -- under the Eugene police department
8 policies?
9    A.   No.
10   Q.   So in your opinion sitting here today, you
11 were not being uncooperative before you were taken
12 to the ground?
13   A.   No. I had no problem going to jail.
14   Q.   Didn't charge Officer Sharlow?
15   A.   No. I guess if I wanted to leave and not
16 be arrested and be uncooperative and be difficult,
17 then when I was approached by the police officers I
18 would have got up next to my Lexus and run away.
19 And then they could have tried to catch me and we
20 could have been on a street chase.
21        I let them handcuff me. I let them put me
22 in the car. I let them bring me to the sally port.
23        Like I said, in the sally port if I was
24 being difficult the officer could have walked away.
25 I wouldn't have been able to do any damage other

### Page 77

```
                J. VandeGraaf                           77
 1   than to myself -- 15-foot high walls, one police
 2   cruiser, me handcuffed and intoxicated.
 3           And at that time he had, I'm assuming, his
 4   bulletproof vest on, his belt with his gun and extra
 5   live ammunition, police baton.
 6     Q.   Do you think your judgement was impaired
 7   during this whole --
 8     A.   I do.
 9     Q.   How do you think that affected how you
10   acted?
11     A.   It made me act impolite and unbecoming.
12     Q.   Was this before or after you were taken to
13   the police station?
14     A.   Before.
15     Q.   How about after you were taken to the
16   sally port and got out of the car?
17     A.   Like I said, I didn't do anything in the
18   sally port.
19     Q.   I think you said you may have said some
20   things.
21     A.   Yeah.  I'm saying I didn't do anything.
22     Q.   You didn't actually physically do
23   anything?
24     A.   Yeah.
25     Q.   But you may have said some things?
```

### Page 78

```
                J. VandeGraaf                           78
 1     A.   Yeah.  I may have said some things.
 2     Q.   But you don't remember?
 3     A.   No.
 4     Q.   But you may have said some things?
 5     A.   I was coherent to know I wasn't doing
 6   anything illegal, because I'm a big fan of the law,
 7   sometimes, and you are not allowed to threaten
 8   anyone's life ever.  That's why what I said to
 9   officer Vreim wasn't illegal.
10     Q.   Wasn't or was?
11     A.   Wasn't.
12          MR. VERGAMINI:  I'm sorry.  Go ahead.
13   I was going to ask if this is a good time for a
14   break.
15          MS. COIT:  Sure.
16          (A recess was taken.)
17          (The last question and answer were
18            read back.)
19   BY MS. COIT:
20     Q.   So do you think it was unreasonable for
21   Officer Sharlow to want you on the ground --
22     A.   Yes.
23     Q.   -- at that point?  In your opinion what
24   should he have done instead?
25     A.   Walked me over to the glass door, taken
```

### Page 79

```
                J. VandeGraaf                           79
 1   his gun out, put it in the locker and booked me and
 2   just left me in jail.
 3     Q.   So what happened after you were taken to
 4   the ground?
 5     A.   After I was taken to the ground I had a
 6   boot hit me right here.  My head was forced into the
 7   pavement with more pressure than I would assume
 8   needed.  I'm not sure, you know.
 9          And I don't remember anything after that
10   until I woke up in the jail the following morning.
11   I'm not even sure of the time.  It seemed like it
12   was later morning.
13     Q.   Tell me about the boot to the head.  Was
14   that somebody kicking you or holding your head down
15   with a foot?
16     A.   It was -- I couldn't say it was a kick.
17   No.  If somebody kicked my head, it would have been
18   different.  It was assisted pressure.  The foot felt
19   like, you know, a nice, solid, you know, putting
20   your foot on someone's head.
21          So he didn't smash it in multiple times.
22   That I remember.  Like I said the first time, it
23   made contact; I was out.
24     Q.   What do you think -- so you think you were
25   knocked out?
```

### Page 80

```
                J. VandeGraaf                           80
 1     A.   I was.
 2     Q.   What knocked you out?  Do you know?
 3   Hitting your head on the ground or the boot on your
 4   head?
 5     A.   Well, the boot on the head is the last I
 6   remember, so it must have been that.
 7     Q.   Do you remember hitting the ground?
 8     A.   No.
 9     Q.   Do you know what you hit on the ground?
10     A.   What I hit?
11     Q.   Did you just hit the concrete?
12     A.   Yep.
13     Q.   With your chin?
14     A.   I guess so.  I just fell forward.  I had
15   been drinking.  I was intoxicated.  I had that boot
16   in the back of the head and, like I said, I don't
17   remember anything.
18          I could tell you what I was told happened
19   after that, but I don't know.
20     Q.   Do you think the drinking had any affect
21   on you being able to stay on your feet?
22     A.   Stand on my feet?
23     Q.   Had you not been drinking, do you think
24   you may have stayed on your feet?
25     A.   I was on my feet.
```

```
                J. VandeGraaf                          81
 1   Q.     At some point you weren't on your feet.
 2   A.     After he kicked my feet out from
 3   underneath me. I don't think alcohol played any
 4   part in that.
 5          If somebody kicked my feet out from
 6   underneath me right now, completely sober, I would
 7   still fall to the ground if I was handcuffed behind
 8   my back because you don't have hands to break your
 9   fall. You fall forwards or backwards depending on
10   where your body leans.
11   Q.     Do you recall Officer Sharlow's hand
12   giving you any support as you went down?
13   A.     No.
14   Q.     Do you recall that he didn't give you any
15   support?
16   A.     I do. I remember that I fell straight to
17   the ground whereas if he had kept his hand on my
18   hooded sweatshirt, I'm assuming my upper body would
19   have stayed above the ground. So he let go of that
20   while I fell.
21   Q.     Now, you were going to tell me what
22   someone told you had happened?
23   A.     Yeah, I was told --
24   Q.     First, who? Who told you?
25   A.     This same deputy that had me pretty much
```

```
                J. VandeGraaf                          82
 1   the whole time. He was, I guess, kind of assigned
 2   to me. Real nice guy.
 3          He told me, you know, that he had heard,
 4   because it was going around like, I guess, gossip at
 5   jail -- you know, "Did you hear about the guy in the
 6   sally port?" -- that they wouldn't let Sharlow bring
 7   me into jail because I was bleeding.
 8          This (indicating) was all split up.
 9          So you did it; you go take care of it.
10          So I was escorted to Sacred Heart Medical
11   Center I'm assuming by Sharlow.
12          Then when I went in the following day with
13   this deputy, I saw for the first time, for me, a
14   couple of people in the hospital that remembered me
15   from the night before. And they said that I was
16   extremely difficult at the hospital and that it took
17   multiple people to, you know, calm me down and stuff
18   so that they could take this X-ray and sew me up and
19   stuff. I wasn't very happy.
20   Q.     Do you remember any of that?
21   A.     I don't. No. Apparently they X-rayed me
22   and they said, "Yeah, you're fine," you know.
23          But again, you know, the sheriff's
24   department brought me back, because after I woke up
25   I was arraigned upstairs in jail and I was brought
```

```
                J. VandeGraaf                          83
 1   downstairs for booking. And they took my mug shot,
 2   took my fingerprints. And I had been complaining
 3   about pain since I woke up. I was asking them for
 4   ibuprofen. It looked like a rash.
 5          So this one lady, she took some sympathy
 6   on me, and she called a nurse at the jail who was
 7   maybe an Asian-descent type guy. Got glasses, a
 8   male nurse, doctor over there at the jail. He took
 9   a look at my jaw. "This isn't right," because it
10   was hanging on and stuff. That's when I was
11   assigned to this deputy.
12          And they brought me down. And I wasn't at
13   the hospital for very long once I was seen. I had
14   to wait there for a little while. I remember I
15   didn't give them any of my information. I wasn't
16   into participating at that point.
17   Q.     Was this the next day?
18   A.     This is the next day. This is what I
19   remember.
20          So the deputy gave them all my
21   information, my name, my social security number, the
22   works. And I was like, that's great, you know, I
23   have no rights whatsoever.
24          Then they brought me in for something
25   other than an X-ray. I think it was a CAT scan or
```

```
                J. VandeGraaf                          84
 1   MRI. I can't remember. It didn't take long.
 2          And then I was laying in the bed. Maybe
 3   ten minutes went by and they came over, "Yep, your
 4   jaw is broken in two." They didn't tell me it was
 5   in two different places. I didn't find that out
 6   until after the surgery. But yeah, "Your jaw is
 7   broken," blah, blah, blah, "We have to do surgery."
 8          They gave me a big shot of drugs in my
 9   butt. Put me out. Said I wasn't allowed to eat
10   anything or drink anything before the surgery. They
11   couldn't confirm I hadn't eaten or drunk anything,
12   even though I had been in custody. So they brought
13   me back to the jail, and then I had surgery the
14   following day.
15   Q.     So why do you think you can't remember
16   what happened at the hospital?
17   A.     I don't know. I'm not a doctor.
18   Q.     Have you told any doctor that you don't
19   have any memory of that period of time?
20   A.     No. I don't have insurance so I don't go
21   see doctors.
22   Q.     But you are saying you can remember
23   everything up to the boot being placed on your head?
24   A.     Yes.
25   Q.     And then it's just a complete blank?
```

```
                J. VandeGraaf                         85
 1    A.    Complete blank.
 2    Q.    Is the memory before that a little fuzzy
 3  or is it crystal clear in your mind?
 4    A.    Crystal clear in my mind.  I can close my
 5  eyes and picture myself.
 6    Q.    And you think you got your memory back
 7  when you woke up the next day?
 8    A.    I did get my -- I didn't get my memory
 9  back.  I don't remember what happened.
10    Q.    You started remembering again, I guess.
11    A.    I was coherent to what was going on when I
12  woke up.
13    Q.    Sitting here today you can remember waking
14  up?
15    A.    That I woke up in jail.  Yep.  Yep.
16    Q.    After your surgery, did you go back to
17  jail?
18    A.    Yep.
19    Q.    How long were you in jail?
20    A.    I was in jail for a total of 11 days.
21    Q.    Were you in a special medical wing?
22    A.    Yep.  I was locked up in solitary in a
23  medical unit.  I was put in the corner cell.  I
24  couldn't see anybody and nobody could see me unless
25  the guard walked up to a little window about that
```

```
                J. VandeGraaf                         86
 1  big (indicating).  And I was denied any type of pain
 2  medication for an extended period of time.
 3          Then after the surgery my mouth was wired
 4  shut.  They moved me to a different room with huge
 5  glass windows so that they could see me, because the
 6  doctor informed them that I could choke on my own
 7  vomit if I threw up and I could die.  So they gave
 8  me a special bed, Craftmatic-type deal, you know.  I
 9  was pretty much put in the penthouse suite at jail.
10  And they were able to keep a much better eye on me.
11  I was able to walk around because it was big enough
12  to kind of walk around.
13          MR. VERGAMINI:  Can I clarify for the
14  record, when Mr. VandeGraaf noted a window was so
15  big that he was making a gesture that was about 6
16  inches --
17    A.    It's like a 4-inch-wide by maybe
18  6-inch-in-height window that's on those doors.
19  BY MS. COIT:
20    Q.    This is the first --
21    A.    The medical.  The first cell.
22    Q.    The first cell you were in before your
23  surgery?
24    A.    Yes.  And after, in the very beginning.
25    Q.    How long were you in that cell?
```

```
                J. VandeGraaf                         87
 1    A.    I think I was in that one for like a week.
 2    Q.    A week?
 3    A.    Yeah.  It wasn't until I went for my post
 4  checkup, which was outside of the hospital -- I went
 5  to Dr. Timothy Welch's office on Country Club Road
 6  with a deputy.  And there they changed it around a
 7  little bit.  When I came back, I got my medicine
 8  more on time and then they moved me.
 9    Q.    Was this the same deputy that had been
10  driving you around?
11    A.    No.
12    Q.    This was a different deputy?
13    A.    Yeah.
14    Q.    When you said you were denied any pain
15  medication, for what period of time was that?
16    A.    Better part of a week.  I would get it,
17  but nowhere near as much as I needed.  And they
18  informed me that they didn't care.  They were like,
19  "We are not here to serve you."
20          My doctor told me that I was supposed to
21  receive this medication at a certain time.  And the
22  nurse, the med lady who delivers the medication at
23  jail, was like, "I've got a hundred-and-this-many
24  people to give stuff to, and I can't get in here all
25  the time."  So sometimes I would have to wait, you
```

```
                J. VandeGraaf                         88
 1  know, eight hours, ten hours.  I'm supposed to get
 2  this medicine every four hours.  I mean, I went from
 3  -- I don't even know how much morphine they gave me.
 4  I was on a morphine drip.  They would pump morphine
 5  into me every seven minutes.
 6    Q.    You still needed more pain medication?
 7    A.    This was after the surgery, yeah, because
 8  then I left the hospital.
 9    Q.    And you were off the morphine?
10    A.    And I was off the morphine.
11    Q.    And in this lawsuit are you making a claim
12  against the jail staff for how you were treated?
13    A.    No.  I mean, I assume that everybody's got
14  really good employees and really bad.  And I got to
15  meet both of them.
16    Q.    How long did it take for your jaw to heal
17  from the surgery?
18    A.    Oh, a long time.  I don't know.  A couple
19  of months later I could eat food.  So the whole time
20  I was in jail my mouth was unusable, at first
21  because my jaw was hanging on and then second
22  because my mouth was wired shut.
23          So my doctor gave me a plastic syringe
24  with an angled tip that I could inject into water or
25  any type of liquid and I could fill up and stick it
```

J. VandeGraaf 97

1 and they say something in court, people tend to
2 agree with them more because they hold a higher
3 position in the community than I do.
4     For instance, if I was driving in the
5 country in my Lexus and I were to be pulled over by
6 Officer Sharlow, he could shoot me and put a gun in
7 my car. And it would be like, "Oh, Mr. VandeGraaf
8 tried to pull a gun on me." You know what I mean?
9 I'm out there alone. I used to tell people that I
10 was really afraid.
11     Never of anybody at the sheriff's
12 department. I was in jail -- the whole time I never
13 had any deputies at the sheriff's department be
14 really mean to me directly or unbecoming or
15 anything.
16     And I have actually not really had any
17 problems with any of the Eugene police officers.
18     But of course with what happened, you
19 know, waking up knowing that that officer directly
20 -- you know, Vreim didn't do anything to me. He
21 wasn't there. He was talking with Tiffanie. But,
22 you know, Sharlow had the advantage and he took
23 advantage of it. And, yeah, I would be scared if I
24 was pulled over by him.
25   Q.   So are you saying -- what I think you are

J. VandeGraaf 98

1 saying is you don't have any problem with the Eugene
2 police department. It's just a problem with Officer
3 Sharlow.
4   A.   Yeah.
5   Q.   Do you think the Eugene police department
6 did anything wrong in this situation?
7         MR. VERGAMINI: Object to the form of
8 the question. It's asking him for a legal
9 conclusion.
10   A.   I think the Eugene police department is
11 responsible.
12 BY MS. COIT:
13   Q.   Why do you think that they are
14 responsible?
15   A.   Because Officer Sharlow works for them.
16   Q.   Okay.
17   A.   And I actually was just notified by my
18 lawyer that he was taken off the case or out of the
19 case from a request from you guys, which I totally
20 did not know of and did not approve. But I
21 understand that things happen. Life moves on.
22     I don't hold anything against Sharlow
23 personally. He was like it's going to be better,
24 take him out of the case, whatnot.
25     I guess to put it in a perspective so you

J. VandeGraaf 99

1 understand, if I were to do something to a customer
2 at Steelhead Brewery, people could still sue the
3 brewery even though the brewery didn't do anything
4 because I work for them.
5   Q.   So that's why you are likening --
6   A.   I guess that's what I'm doing. I'm not a
7 lawyer. I guess that's how it works. I'm just a
8 server.
9   Q.   Are you currently receiving any medical
10 treatment for your injuries?
11   A.   No.
12   Q.   Were your medical bills paid for by the
13 City?
14   A.   No. None of them were paid for by the
15 City.
16   Q.   Were they paid for by somebody?
17   A.   65 percent of my bills were paid for by
18 the sheriff's department, but definitely not the
19 City of Eugene. And I've actually been served
20 papers at work for small claims, which are still
21 coming after me for money for anesthesia I had for
22 the surgery.
23   Q.   How much do you still owe?
24   A.   I still owe, for the anesthesia, $600; for
25 my dentist, 2,000; and Timothy Welch and the

J. VandeGraaf 100

1 hospital -- I'm not even sure.
2   Q.   Have you paid any of that or is it all
3 still outstanding?
4   A.   I've actually refused to pay it because I
5 find that I'm not responsible for it. I've talked
6 to them all and told them, like, if I was out and
7 did this to myself, you know, I would have no
8 problem paying for it. If I didn't have the money,
9 I would set up a payment program.
10     But as this is something I didn't do to
11 myself -- it was done to me -- I can't find myself
12 as somebody who is going to pay for it, whether I
13 have the money to pay for it or not.
14   Q.   Do you have any other out-of-pocket
15 expenses related to this injury?
16   A.   No. Timothy Welch, Sacred Heart Medical
17 Center, Northwest Anesthesia, and Oregon Family
18 Dental is it.
19   Q.   So -- I apologize if I may have already
20 asked this. Can you tell me how you believe the
21 City of Eugene failed to properly train its
22 officers?
23   A.   Can I tell you that? No. I can't tell
24 you that.
25   Q.   Do you think that the City of Eugene

```
                J. VandeGraaf                            121
 1  situation or a temporary one?
 2     A.   No.  It was temporary.  What the plan was,
 3  she was going to get a job and start meeting people
 4  at her job and hopefully become friends with some
 5  people.
 6     Q.   Let's talk about the living situation.
 7     A.   Eventually she would be able to have her
 8  own money from her job.  I would have my own money
 9  from my own job.  Then she could move in and have an
10  apartment somewhere or a place to live.  And then I
11  would have a place to live.
12          That's why I was trying to build a bridge
13  to her getting a job versus me having two jobs.
14  Because if I have two jobs forever, then I will
15  always be supporting her.  If she can make her own
16  money, then I can spend more time with my daughter.
17     Q.   The plan was you would live apart, but you
18  were helping her out temporarily by providing a roof
19  over her head.  Is that correct?
20     A.   Yes.
21     Q.   Now, there was testimony that -- you were
22  asked if you suffered any anxiety or depression
23  after the incident.  I'm going to break that down.
24  If you weren't or didn't, tell me.  This is not a
25  trick question in any way.
```

```
                J. VandeGraaf                            122
 1          So were you depressed for a period of time
 2  after this incident occurred?
 3     A.   With the anxiety and depression -- I'm not
 4  a doctor.  I haven't been -- haven't gone to see any
 5  doctors for it.  I'm still depressed, I guess.
 6          If you want to say anxiety, you know, I
 7  get emotional when I hear certain songs on the radio
 8  that I remember were our songs.  When I say us, I
 9  mean me and my daughter.
10          I don't know if my daughter's alive.  I
11  sure hope she is.  I have no whereabouts of her.
12          You know, very few people in this world
13  love their children the way I love my daughter.  And
14  that isn't an opinion.  That's like a factual
15  statement.  I know a lot of people, and they all
16  have children.  Some people don't really like their
17  kids.  Some people consider their kids a nuisance.
18  Some people don't interact with them.  For me, she
19  was why I woke up in the morning.
20     Q.   I understand.  The question that I have,
21  though, is since the incident with Officer Sharlow
22  where you were tripped, thrown to the ground, had
23  your jaw broken, have you -- I'll break it down into
24  some symptoms.  Did you -- You were in pain for a
25  period of time after that.  Is that right?
```

```
                J. VandeGraaf                            123
 1     A.   Yep.
 2     Q.   Physical pain.  Were you able to sleep at
 3  night because of this pain?
 4     A.   No.  I don't actually normally sleep more
 5  than three to five hours.
 6     Q.   How long did the pain last?  I know you
 7  had testimony about this earlier.
 8     A.   It was really strong after it happened.
 9  And it dissipated as the months went on.  I would
10  assume three to four months later I felt pretty
11  good.  I could chew meat.
12     Q.   Did you ever have nightmares about what
13  happened?
14     A.   No.  Never about what happened with
15  Sharlow.
16     Q.   Just with Sharlow.  That's all I'm talking
17  about.
18     A.   No.  Never when I was dreaming -- like I
19  had mentioned earlier, for a while I was pretty
20  afraid and I would tell my friends and stuff.  And
21  they were like, "Oh, you are just being paranoid."
22          But I lived out of town.  Every time a cop
23  siren went by or anything, I felt very -- I could
24  not believe I was put in this position with the lack
25  of evidence.
```

```
                J. VandeGraaf                            124
 1          In the report Officer Vreim states that
 2  when he looked at Tiffanie, there was no physical
 3  damage done to her.
 4     Q.   Just what happened at the sally port.
 5  That's all I'm talking about.
 6     A.   No dreams.  No bad dreams.
 7     Q.   And you never went to any mental health
 8  professional or psychiatrist or counselor about just
 9  the incident with Officer Sharlow.  Is that right?
10     A.   No.
11          MR. VERGAMINI:  All right.  I have
12  nothing further at this time.
13          MS. COIT:  I just have a couple.
14
15       F U R T H E R   E X A M I N A T I O N
16  BY MS. COIT:
17     Q.   Do you know if Eugene police officers
18  receive training on how to deal with stress?
19     A.   I honestly don't know anything about
20  Eugene police officers other than they wear a blue
21  uniform and drive a blue car.
22     Q.   And now I just want to understand the
23  physics of how you are telling me this happened.
24  You said you stood up out of the police car and
25  Officer Sharlow was in front of you, facing you.  Is
```

```
                J. VandeGraaf                    125
 1  that right?
 2    A.    Yes.
 3    Q.    Then you say he grabbed your hood that was
 4  on the front of your shirt.
 5    A.    Yes.
 6    Q.    And then he swept your feet out and you
 7  fell face forward?
 8    A.    Mm-hmm.
 9    Q.    Can you tell me how that happened? Where
10  did he contact your legs? In the front of your
11  legs? On the side?
12    A.    The side.
13    Q.    Do you remember which side?
14    A.    Yes, I do. I actually talked about it
15  earlier. I got hit from the right and he swept my
16  legs out towards the left. He kicked me with his
17  right leg towards the police car. Since he is
18  holding my sweatshirt, I fell towards him. He
19  didn't hold onto it; thus my head would not have hit
20  the ground. He was standing right next to my head.
21  Fell towards him. Boot right to the head.
22    Q.    So he swept you out sideways towards the
23  police car, but you somehow fell forward. And you
24  did not fall on Officer Sharlow?
25    A.    I did not.
```

```
                J. VandeGraaf                    126
 1    Q.    But you did fall forward?
 2    A.    Yes.
 3    Q.    Not towards the police car?
 4    A.    Not towards the police car. Next to it.
 5    Q.    You are sure he wasn't standing next to
 6  you?
 7    A.    Yes, I am sure.
 8    Q.    Okay. And then when you were talking
 9  about the depression and getting emotional, you are
10  linking that to losing your daughter. Is that
11  correct?
12    A.    Yes.
13          MS. COIT: That's all I have. Thank
14  you.
15          (The deposition was concluded
16           at 12:16 p.m.)
17
18
19
20
21
22
23
24
25
```

```
              Reporter's Certificate              127
 1  State of Oregon    )
                       ) ss.
 2  County of Lane     )
 3
 4      I, Eleanor G. Knapp, CSR-RPR, a Certified
 5  Shorthand Reporter for the State of Oregon, certify
 6  that the witness was duly sworn and the transcript
 7  is a true record of the testimony given by the
 8  witness; that at said time and place I reported in
 9  stenotype all testimony and other oral proceedings
10  had in the foregoing matter; that the foregoing
11  transcript consisting of 126 pages contains a full,
12  true and correct transcript of said proceedings so
13  reported by me to the best of my ability on said
14  date.
15      If any of the parties or the witness requested
16  review of the transcript at the time of the
17  proceedings, such correction pages are attached.
18      IN WITNESS WHEREOF, I have set my hand and CSR
19  seal this 4th day of May 2009, in the City of
20  Eugene, County of Lane, State of Oregon.
21
22  _____
23  Eleanor G. Knapp, CSR-RPR
24  CSR No. 93-0262
25
```

Reporter's Certificate

```
 1   State of Oregon      )
                          )
 2   County of Lane       )

 3

 4      I, Eleanor G. Knapp, CSR-RPR, a Certified

 5   Shorthand Reporter for the State of Oregon, certify

 6   that the witness was duly sworn and the transcript

 7   is a true record of the testimony given by the

 8   witness; that at said time and place I reported in

 9   stenotype all testimony and other oral proceedings

10   had in the foregoing matter; that the foregoing

11   transcript consisting of  126  pages contains a full,

12   true, and correct transcript of said proceedings so

13   reported by me to the best of my ability on said

14   date.

15      If any of the parties or the witness requested

16   review of the transcript at the time of the

17   proceedings, such correction pages are attached.

18      IN WITNESS WHEREOF, I have set my hand and CSR

19   seal this  4th  day of  May  2009, in the City of

20   Eugene, County of Lane, State of Oregon.

21

22   _____

23   Eleanor G. Knapp, CSR-RPR

24   CSR No. 93-0262

25
```

C & C Court Reporting     541-485-0111

Exhibit 1
Page 17 of 17

## CERTIFICATE OF SERVICE

I certify that on May __11__, 2009, I served or caused to be served a true and complete copy of the foregoing **DECLARATION OF ANDREA COIT IN SUPPORT OF THE CITY OF EUGENE'S MOTION FOR SUMMARY JUDGMENT** on the party or parties listed below as follows:

| | |
|---|---|
| __X__ | Via CM / ECF Filing |
| _____ | Via First Class Mail, Postage Prepaid |
| _____ | Via Email |
| _____ | Via Personal Delivery |

Michael Vergamini
Attorney at Law
399 East 10th Avenue, Suite 207
Eugene, OR 97401
Attorneys for Plaintiff

HARRANG LONG GARY RUDNICK P.C.

By: _/s/ Andrea D. Coit_
Jens Schmidt, OSB #843417
jens.schmidt@harrang.com
Andrea D. Coit, OSB #002640
andrea.coit@harrang.com
Telephone:     (541) 485-0220
Facsimile:       (541) 686-6564

Of Attorneys for Defendant City of Eugene

00227002.DOC;1

**CERTIFICATE OF SERVICE**